# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 4464 | **DATE** | 5/18/2011 |
| **CASE TITLE** | Robert Grayson *et al.* vs. Pacesetter Capital Group, *et al.* | | |

**DOCKET ENTRY TEXT**

Defendant Village of Alsip's motion to dismiss [61] is granted.

■[ For further details see text below.]  Docketing to mail notices.

## STATEMENT

    Plaintiffs allege that four employees working for the Burr Oak Cemetery ("BOC") in Alsip, Illinois, engaged in a scheme in which they dug up over 300 graves and moved bodies to different locations, in order to re-sell the plots for a profit. (First Am. Cmplt. ¶ 1.) The scheme was revealed on July 9, 2009, and had been going on for some time. (*Id.* ¶¶ 1, 3.) Plaintiffs have family members who are buried in the cemetery and whose graves have been disturbed. Plaintiffs seek to represent a class of similarly situated individuals. Jurisdiction is based on the Class Action Fairness Act because there is minimal diversity and the damages sought are over $5 million.

    Plaintiffs have not named the four BOC employees as defendants. Instead they have sued the owners of BOC, which are a series of corporations based in Texas and Arizona, and BOC's CEO and CFO (collectively, the "BOC defendants"). Plaintiffs have also named the Village of Alsip ("Alsip") as a defendant. After this lawsuit began, the BOC defendants filed for bankruptcy in the Northern District of Illinois. The proceeding is still pending according to the parties. At several subsequent status hearings, the parties were uncertain about whether this case could go forward while the bankruptcy was proceeding. Ultimately, plaintiffs decided to file an amended complaint in which they have eliminated all counts except for two against defendant Alsip. But plaintiffs' apparent intent is to assert those claims later, as they leave the BOC defendants in the caption and state in the body of the complaint that no relief is currently being sought against those defendants because of the automatic stay.

    The two claims against Alsip are Illinois common law claims, one for aiding and abetting and one for civil conspiracy. The aiding and abetting claim asserts that Alsip knew about the scheme and thereby "substantially assisted BOC and its employees in committing the tortious conduct." (¶ 32.) The conspiracy claim alleges that Alsip "impliedly agreed" at a March 21, 2005 meeting "to participate in the unlawful act of digging up burial plots of interred bodies in order to re-sell them for a profit." (¶ 35.)

    Now before the Court is Alsip's motion to dismiss these two counts. Alsip relies on both the Illinois common law public duty rule and the Illinois Tort Immunity Act, 745 ILCS 10/4-102, and argues that the

complaint must be dismissed because plaintiffs are merely seeking to hold Alsip liable for failing to prevent, detect, or investigate possible crimes. Plaintiffs recognize that if they can only show Alsip failed to investigate or detect the scheme, they cannot prevail. Instead, for both counts now at issue, plaintiffs must meet a higher burden of showing Alsip's "knowledgeable participation" in the fraudulent scheme. (Pls. Resp. at 7.) Alsip argues that the facts alleged fail to show it knew of the scheme.

Before addressing this argument, we must first briefly consider Alsip's jurisdictional argument, which is a two-paragraph argument inserted at the end of Alsip's opening brief. Alsip argues that jurisdiction under the Class Action Fairness Act ("CAFA") no longer exists because the amended complaint no longer seeks relief against the BOC defendants, thus allegedly destroying diversity because the named plaintiffs live in Illinois and Alsip is located in Cook County. Alsip seems to agree that CAFA jurisdiction was present initially when the original complaint was filed because at least some of the BOC corporations have their principal place of business in Texas. No one disputes that the amount in controversy exceeds the $5 million threshold.

In their response to this argument, which is also a two paragraph argument tucked at the end of their brief, plaintiffs raise three points. First, they assert it is reasonable to assume that some class members live outside of Illinois. Second, the "object of this class action remains the acts entered into by all eight original defendants." (Resp. at 9.) Third, since jurisdiction existed when the lawsuit was filed, it still exists under the Seventh Circuit's "once jurisdiction, always jurisdiction" principle under which CAFA jurisdiction is not lost by developments after suit is filed. (*Id.* at 10, citing *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010).)

We find plaintiffs' arguments persuasive. Plaintiffs apparently are still pursuing claims against the BOC defendants, and their assertion that some class members likely live outside of Illinois is not really contested by Alsip in its reply brief. At a minimum, this issue would require further discovery. Based on these points and given the brief treatment of the issue by the parties, we are not persuaded by Alsip's argument that jurisdiction has been lost.

We therefore turn to the main issue. Does the amended complaint contain enough specific facts to survive a Rule 12(b)(6) motion to dismiss? The question hinges, as both parties agree, on how we apply the new Rule 12(b)(6) "plausibility" standard set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009). The Court held that the "mere possibility of misconduct" is not enough to survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1950. A plaintiff instead must plead facts showing the claim is plausible, although it need not be probable. *Id.* at 1949. As the Seventh Circuit recently observed, where the *Twombly* line is drawn is "not an easy question to answer" and courts have struggled with it. *Swanson v. Citibank*, 614 F.3d 400, 403 (7th Cir. 2010). Moreover, as the Supreme Court stated in *Iqbal*, the plausibility question is a "context-specific task" requiring a court "to draw on its judicial experience and common sense." 129 S.Ct. at 1950.

In reviewing these two Supreme Court cases, we find *Twombly* provides the best analytical framework as well as the closer factual parallel to this case. *Twombly* involved a class action antitrust claim arising out of the breakup of AT&T. Plaintiffs' case rested on an initial factual premise, which was the absence of meaningful competition among the regional Baby Bells created after the AT&T breakup. This fact posed an implicit question – why no competition? Plaintiffs answered the question by suggesting the absence was due to a conspiratorial agreement not to compete. 550 U.S. at 551. But a competing explanation existed. The competitors could have independently come to the same self-interested business conclusion. The alternative explanation was one recognized by both courts and antitrust commentators who agreed that "mere interdependent parallelism" is normally not enough to establish a conspiratorial agreement. *Id.* at 553-54. As the Court summarized: "[t]he inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior; consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554. This choice between the two explanations was alliteratively described by the lower court in

*Twombly* as one between "collusion" and "coincidence." *Id.* at 553. Given the two possible explanations, one legal and one not, the Court held that a plaintiff seeking to survive a Rule 12(b)(6) motion to dismiss must plead enough facts to show "plausible grounds to infer an agreement." *Id.* at 556. A mere possibility is not enough because "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.* at 566. One rationale underlying this conclusion was the practical concern about far-reaching discovery covering an extremely large class over a 7-year period and also the possible *in terrorem* effect on settlement. *Id.* at 557-58.

Although not an antitrust case, this case involves a similar analytical framework. Like *Twombly*, it begins with a factual premise  The premise, taken as true by both sides for purposes of this motion, is that four BOC employees engaged in a widespread scheme (moving over 300 bodies) over a wide time period (going back perhaps before 2000). This fact in turn raises a natural question with regard to defendant Alsip: why did Alsip police not stop the scheme? As in *Twombly*, two basic explanations are offered, one legal and one not.

Plaintiffs infer that police failed to stop the scheme because they were involved in and profiting from it. To support this argument, plaintiffs point to several incidents over a 10-year period in which Alsip police were told about allegedly suspicious activity at the cemetery. Plaintiffs believe the reports of suspicious activity were obvious clues no police officer could miss, thus leading to the conclusion that they knew of the scheme.

The alternative explanation is that Alsip police, despite receiving a few possible clues, never became aware of the scheme, never quite connected the dots from these reports. The reason is that the reports were few, isolated, and ambiguous. At best, they suggested one-time events such as teenage vandalism. In short, Alsip maintains plaintiffs have no credible evidence to show Alsip actually knew of the scheme. The reasons for not knowing could be as varied as the reasons why any governmental organization fails to perform as expected.  It could be the result of a rational calculation about how to allocate limited police resources and where to concentrate criminal investigations. Or it could be the result of more mundane failings of human nature or governmental bureaucracy.  Perhaps the department did not keep organized records and the police officers who responded to the later reports were unaware of earlier incidents. Perhaps the investigating officers who responded to the suspicious activity did a cursory investigation and failed to follow up on leads simply because they were -- for lack of a better term -- lazy. Either way, whether the failure was a rational choice or mere negligence, Alsip cannot be held liable because the Illinois common law public duty rule and Tort Immunity Act hold that municipalities may not be held liable for "failure to supply general police or fire protection." *Huey v. Town of Cicero*, 243 N.E.2d 214, 216 (Ill. 1969). As the Illinois Supreme Court stated in *Huey*, simply knowing about *possible* illegal behavior is not enough to prevail; it is also not enough to survive a motion to dismiss. *Id.* As Alsip summarizes in its opening brief, "[l]imiting a municipality's duty to preserving the well-being of the community at large rests upon the public policy consideration that a police department's negligence, oversights, blunders or omissions cannot be treated as the proximate or legal cause of harms committed by others." (Mem. at 4; citing cases.)

With these standards in mind, we now turn to the specific facts alleged in the first amended complaint (Docket # 55.) They are set forth in the following paragraphs, which we quote in their entirety:

> 27. As far back as 2000, Alsip had reason to suspect that BOC and its employees were tampering with grave sites. Two ALSIP Public Safety Incident Dispatch Detail Reports, one from September 8, 2000 and another from May 17, 2001, both detail that police were dispatched to the cemetery after receiving complaints of vehicles running over plots and markers. On both instances, the police reported that the employees and ground crew said they did not see any vehicles.
>
> 28. In 2005, Alsip had reason to believe that bodies were being removed from graves. On

or about March 17, 2005, Alsip was notified that ComEd workers had found skeletal remains on the roadside next to the cemetery property at 123rd and Cicero. Pictures taken on March 18, 2005 were a clear indication that it was not a one-time mistake, as there were bones scattered across several areas.

30. Further, on or about March 21, 2005, a meeting was held at the office of Ms. Carolyn Towns, then Director of Cemetery Operations at BOC. Present at the meeting were Carolyn Towns, Michael K. Sterr (Cook County Highway Department), Michele Kadich and James Werner (ComEd), Rocco Danna and Guy Nelson (K-Five) and Robert C. Stark of the Alsip Police Department. These individuals, including three representatives of Alsip, discussed the remains found on March 17 and decided to simply collect the remains and re-bury them away from the construction site.

31. On October 9, 2008 a complaint report previously sent to BOC from the son of a woman buried in the cemetery who alleged that his mother's grave was buried a mere fifteen inches below the natural surface of the ground, as opposed to the three feet required under the Burial of Dead Bodies Act, 410 ILCS 5/1 Sec. 7-8 of Burial requirements, was received by Alsip. The same individual previously sent the complaint to BOC. A subsequent inspection by Alsip confirmed that the grave was not buried deep enough. In response, Alsip merely issued a citation to BOC on November 17, 2008 and continued to provide BOC with a license to operate as a cemetery without further investigation.

35. Alsip, by its conduct, impliedly agreed with BOC employees at a meeting held on or about March 21, 2005, to participate in the unlawful act of digging up burial plots of interred bodies in order to re-sell them for a profit.

36. As further evidence of this implied agreement, an Affidavit from Deborah L. Venhuizen, the Village Clerk of [Alsip], is attached as Exhibit 1. It states that she has never received any quarterly reports from BOC setting out the number of burials made in the Burr Oak Cemetery, a failure which violates Chapter 7 of Alsip's Municipal Code Section 7-10. That section is entitled: **"Quarterly Report and Payment of Fee" is hereby amended to: "Section 7-10 Quarterly Report"** "The owner, superintendent or person in charge of each cemetery shall prepare a written report, sworn to by him, and deliver it to the Village Clerk on or before the fifteenth day of April, July, October and January of each year, setting out therein the number of burials made in said cemetery during the preceding quarter."

We can simplify a bit by stripping out conclusory and redundant allegations, leaving the following five facts or assertions: (1) on September 8, 2000, Alsip police received a complaint of vehicles running over plots and markers; (2) on May 17, 2001, the police received a similar complaint of vehicles running over plots; (3) in March of 2005, skeletal remains were found outside the cemetery on a roadside, and a meeting was held a few days later to discuss the finding; (4) on October 9, 2008, Alsip received a complaint that a body had been buried only 15 inches below ground rather than three feet as required by state law; and (5) during an unspecified time, BOC failed to submit required quarterly reports setting forth the number of burials during the quarter.

In both their complaint and response brief, plaintiffs repeatedly fall back on these five facts. The question is whether they are enough under *Twombly*. This is not merely an inquiry into the amount of facts. Quality also matters. As the Seventh Circuit stated in discussing *Twombly*, a court should ask whether the complaint presents "a story that holds together." *Swanson*, 614 F.3d at 404.

# STATEMENT

In assessing plaintiffs' five facts, one overarching and recurring problem is plaintiffs' failure to explain how these five low-level facts collectively work together and lead up to the larger conclusion that Alsip police were involved in massive criminal scheme over a long period of time. What is missing are the intermediate level inferential steps to create a logical pathway from these small discrete facts to the grand conclusion of a conspiracy. Plaintiffs never really grapple with the facts nor attempt to explain or analyze them -- even though many of the facts are neutral on their face. At one point, plaintiffs describe the conspiracy as a "complex plan." (Resp. at 3.) Yet, the analysis basically ends there. No explanation is ever forthcoming about the details of the complex plan. Merely calling the alleged scheme complex does not meet the *Twombly* standard. As explained below, these five facts relied on by plaintiffs raise as many questions as answers and ultimately they fail to tell a plausible story.

As an initial point, we are not clear on the basic timing of the scheme and when participants allegedly became involved. As for the four BOC individuals who perpetrated the scheme, the complaint states in paragraph 3 that they began the conspiracy "at least several years ago," which would roughly put it around 2006 or 2007. But later in the complaint, plaintiffs suggest the four began their scheme much earlier, at least by 2000 because this is when the first report came in of a vehicle running over grave plots. As for Alsip police, a similar ambiguity arises. The complaint suggests Alsip decided to participate in the conspiracy during the meeting on March 21, 2005 meeting. But the complaint also states that Alsip had "reason to suspect" that BOC employees were tampering with graves in 2000. Are plaintiffs claiming Alsip actually knew of the conspiracy in 2000 and 2001 and then took several years to decide to join in it, or are they suggesting police merely had suspicions earlier on but didn't really figure it out until 2005? The answer is not clear as plaintiffs in their brief refer to Alsip's "10-year (or more) course of conduct," which seems to indicate they believe Alsip was in on the scheme way back in 2000. (Resp. at 8.) Finally, as to BOC itself (meaning the corporate entity and its CEO and CFO, who are named as defendants), we are unsure whether plaintiffs believe they had knowledge of the scheme. The complaint speaks about their failure to supervise, arguably suggesting they were only negligent in failing to uncover the conspiracy and may never have had actual knowledge (¶¶ 20-23). If they did not know, it raises a question whether it is reasonable to assume Alsip police knew before they did.

Turning to the substance of the five facts, they are ambiguous. Four of the five facts do not have a direct connection to *any* grave tampering, much less to such tampering by BOC employees specifically. Take the two incidents in 2000-01 where an unnamed individual reported vehicles running over plots and markers. Why is it reasonable to assume that the driver of the vehicle stopped, got out and dug up graves, and moved the bodies to another location. Why not apply Occam's razor and adopt the simpler explanation that the individual did nothing more than drive over the plots (one example being joyriding teenage vandals)? Looking next at the 2008 report of a grave buried only 15 inches rather than the required 3 feet. Plaintiffs again offer a fact but then fail to tell us what it is supposed to indicate. Why does this fact indicate a grave-tampering scheme is underfoot rather than, say, a lazy worker who took a shortcut in his job? Perhaps in the cemetery business this seemingly neutral fact of a shallow burial is indeed a red flag that bodies are being moved, but if so, plaintiff never comes forward with any such counterintuitive explanation. Therefore, as the Supreme Court instructed in *Iqbal*, we must fall back on common sense. Finally as to the alleged failure to submit quarterly reports about the amount of burials, we again are uncertain as to the specific way in which this omission was important to the scheme. Why couldn't the four wrongdoers simply submit a false report? What was it about reporting the raw amount of burials that would have uncovered the fraud? Was the number somehow cross-checked against an independent source or against the capacity of the cemetery? Relatedly, plaintiffs fail to offer any baseline or context about such reports. Was it highly unusual for a cemetery not to submit them? Regulations can be ignored or weakly enforced for a lot of reasons.

Aside from their sketchiness, the reports are infrequent. The first occurred in September 2000. The second is eight months later. (As noted above, neither really suggests any tampering was going on.) After these two, nothing happens for almost four years until March 2005, when the skeletal remains are found.

Then another three and half years go by without any reports, at which point the complaint is made about the shallow burial. These gaps are large and irregular and the details of each incident (with the exception of the first two) do not fit a common pattern, although they are not contradictory either. If anything, their infrequent nature could suggest to a reasonable police officer that the incidents were caused by isolated individual wrongdoers, rather than being the product of a systematic, large, and ongoing 10-year scheme by BOC insiders.

Similarly vague and unclear is what police supposedly failed to do in responding. Plaintiffs seem to believe (though again they never say explicitly one way or another) that police could have easily determined from these reports that BOC insiders were behind it all. In reviewing the specific allegations, however, we find little to support this theory. Going back to the two reports in 2000 and 2001, Alsip police responded by going to the cemetery and speaking with BOC employees who said they did not see any vehicles. On its face, this description is neutral. It sounds like police were unable to figure out what happened and did what they could given what information they learned. Maybe plaintiffs think police should have disbelieved the BOC employees who claimed they didn't see anything. But why? We do not know from the complaint whether the BOC employees interviewed were the four conducting the scheme. Nor do we know whether the employees interviewed would have been in a position to see the vehicles. Finally, we know nothing about who made the report and whether they were a credible source. Police are often required to make difficult on-the-spot judgments about who to believe and whether and how to investigate further. What specifically here should police have done after the BOC employees said they saw nothing? It is easy, in hindsight, to look back and think police should have immediately suspected BOC employees. However, we have to objectively look at the facts known to those officers at the time.

The same general analysis applies to the 2008 shallow burial. Again according to the complaint, the Alsip police did not ignore the report, but instead investigated and even issued a citation to BOC. What else should they have done? It is hard to evaluate the police response without any alternative behavior to compare it with.

As for the more serious allegation of bones being found at a construction site near to the cemetery, this one is admittedly much more explicit and serious. But here again, there was an investigation and response. As explained in the complaint, in response to the discovery of skeletal remains, a meeting was held with representatives from ComEd, the Cook County Highway Department, BOC, K-Five, and Alsip. Everyone there agreed to collect the remains and re-bury them away from the construction site. This description suggests, once again, some form of response at a minimum and arguably a more serious one at that, based on the amount of people and organizations in attendance. The description of exactly what was done is inconclusive. However, it is hard to believe that all these individuals got together to discuss the finding of these remains and didn't discuss various possibilities for why the bones ended up where they did. (The complaint also refers to the fact that pictures were taken before the meeting of the remains, suggesting some pre-meeting investigation was done.) The complaint says everyone agreed after the discussion to "simply" re-bury the remains away from the construction site. The word "simply" carries with it an implied negative critique. But plaintiffs don't go into specifics. What else should the people at the meeting have done and would it have uncovered the scheme?

Also missing from the complaint is a coherent explanation of who at Alsip was involved and what roles they allegedly played. *See Twombly*, 550 U.S. at 564, n.10 (complaint was defective because, among other reasons, it "mentioned no specific time, place, or person involved in the alleged conspiracies" ). Was everyone in on the conspiracy? The complaint contains a few isolated details, but there is no sense of how the pieces fit together. For example, the complaint states that Robert C. Stark of the Alsip police department and "three representatives of Alsip" attended the March 2005 meeting to discuss the skeletal remains. But it is unclear what their roles were with Alsip and how they interacted with the officers investigating the suspicious activity earlier. Were the investigating officers even in on the conspiracy?

More specifically, the complaint states that the decision to join the fraudulent scheme was made at a

| STATEMENT |
|---|

March 21 2005 meeting and was done by "conduct" through an "implied agreement." (¶¶ 35-36.) After initially reviewing the complaint, we assumed the March 21st meeting in which Alsip allegedly joined the conspiracy (described in paragraph 35) was the same March 21st meeting attended by ComEd and many others (described in paragraph 30). But if so, it would seem odd to reach an agreement about a vast and highly illegal conspiracy in a meeting with so many people present, people presumably not in on the conspiracy given they are not named as defendants here. This puzzlement made us look again and, based on the two separate references to a March 21st meeting, it may be that plaintiffs are claiming there was a public meeting later in the day and an earlier meeting the same day with only Alsip and BOC people. This is a possibility (of course, we are speculating here because the complaint doesn't address this ambiguity) but it would then raise a separate question. Why would Alsip and BOC enter into the agreement impliedly and only through conduct if they met privately with no one else? This point actually suggests the first interpretation might be correct. Either way, questions remain. Moreover, if it was wrong (as plaintiffs suggest) to simply re-bury the remains, then why did all the other individuals at the meeting, people not in on the conspiracy, go along with this response?.

On this same topic of who at Alsip was allegedly a part of the conspiracy, we note that the complaint does attach an affidavit of an Alsip employee named Deborah L. Venhuizen, who has been the Village Clerk since 2005. Ms. Venhuizen states in her affidavit that Alsip never received any quarterly reports from BOC setting out the number of burials and that she would have had the "most knowledge" about these matters because her role as Village Clerk. (Aff. ¶ 3.) We are assuming by her willingness to provide an affidavit that plaintiffs' counsel is not asserting she ever was aware of any conspiracy going on. If so, then why did she not know? Also, if it was considered highly irregular not to receive the burial reports, as the complaint seems to suggest, then why did Ms. Venhuizen not take action? (In fairness to Ms. Venhuizen, it is possible she did take action, although the amended complaint does not include this fact.) The bottom line -- the complaint leaves out many contextual details and fails to address obvious questions, making it hard to get a handle on the basic outline of what Alsip supposedly did.

Finally, the complaint offers no theory as to motive. The complaint states that BOC employees were in it for the money. Were Alsip employees also working for money, or was there some other payoff? And how were the payments made without others (such as Ms. Venhuizen) knowing about it?

In sum, we find the allegations against Alsip fail to cross over the *Twombly* line between the speculative and plausible. This conclusion arises from the large number of unanswered questions and gaps and also from the strong public policy in Illinois against holding municipalities liable for failing to investigate or stop certain crimes. We recognize that complaints need not be air-tight nor address all contingencies and questions. It is just that in this specific case the cumulative effect of these inconsistencies lead us to believe plaintiffs are relying on hopeful speculations. This conclusion is also bolstered by some of the same practical concerns mentioned in *Twombly*. This is a class action, though admittedly nowhere near the scale of *Twombly*, involving a similar length time period (here 10 years, there 7). Moreover, as this case now stands, Alsip is the only defendant. It is unclear when or whether the claims will go forward against the other, arguably more culpable defendants. Alsip would be left as the sole alleged wrongdoer, facing potentially large damages, raising the *Twombly* concern about an *in terrorem* settlement.

With Alsip having been dismissed, plaintiffs should file an amended complaint if they wish to proceed against the other original eight defendants.